DDK Hotels, LLC v. Williams-Sonoma, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2020

(Argued: May 27, 2021      Decided: July 23, 2021)

Docket No. 20-2748-cv

————————————————

DDK HOTELS, LLC, DDK/WE HOTELS MANAGEMENT, LLC,
*Plaintiffs-Appellees*,

DDK/WE HOSPITALITY PARTNERS, LLC,
*Plaintiff-Counter-Defendant-Appellee*,

v.

WILLIAMS-SONOMA, INC., WILLIAMS-SONOMA STORES, INC.,
*Defendants-Counter-Claimants-Appellants*.[*]

————————————————

Before:      SACK, LYNCH, and PARK, *Circuit Judges*.

Plaintiffs-appellees DDK Hotels, LLC ("DDK Hotels"), DDK/WE

Hospitality Partners, LLC ("DDK Hospitality"), and DDK/WE Hotels

Management, LLC ("DDK Management") entered into a joint venture with the

defendants-appellants Williams-Sonoma, Inc. ("Williams-Sonoma") and

Williams-Sonoma Stores, Inc. ("West Elm").  Despite a promising start,

disagreements over the vision for the project soon arose.  West Elm allegedly

then began seeking other business partners for the same project, in violation of

———————————————————

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

the parties' joint venture agreement. The plaintiffs-appellees subsequently filed suit against the defendants-appellants in the United States District Court for the Eastern District of New York, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment.

West Elm then brought an action in the Delaware Court of Chancery, seeking to dissolve the joint venture. The Delaware court dismissed the action, concluding that dissolution of the joint venture was not warranted. Following the dismissal of the Delaware action, the plaintiffs-appellees filed a supplemental complaint in the Eastern District of New York, asserting an additional claim against the defendants-appellants for breach of the prevailing party provision of Section 21(h) of the joint venture agreement, which provides that the non-prevailing party is responsible for reasonable costs, charges and expenses incurred by the prevailing party in enforcing the terms of the agreement. The defendants-appellants subsequently moved to compel arbitration of the claim for breach of the prevailing party provision. The district court (I. Leo Glasser, *Judge*) denied the motion to compel arbitration, and the defendants-appellants now appeal, arguing that the district court erred because the joint venture agreement

2

delegates questions of arbitrability to the arbitrator.  We conclude that the joint

venture agreement does not "clearly and unmistakably" delegate arbitrability to

the arbitrator and that the district court therefore correctly ruled on the scope of

the arbitration agreement.

AFFIRMED.

P. CRAIG CARDON (Kari M. Rollins, Tyler E. Baker, *on the brief*), Sheppard, Mullin, Richter & Hampton LLP, *for Defendants-Counter-Claimants-Appellants*;

THOMAS S. FITZPATRICK, Davis, Malm & D'Agostine, P.C., *for Plaintiffs-Appellees and Plaintiff-Counter-Defendant Appellee*.

SACK, *Circuit Judge*:

This action is about a business venture gone awry.  The plaintiffs-appellees

DDK Hotels, LLC ("DDK Hotels"), DDK/WE Hospitality Partners, LLC ("DDK

Hospitality"), and DDK/WE Hotels Management, LLC ("DDK Management")

entered into a joint venture with the defendants-appellants Williams-Sonoma,

Inc. ("Williams-Sonoma") and Williams-Sonoma Stores, Inc. ("West Elm") in the

hopes of developing a line of boutique hotels that would complement West Elm's

home furnishing business.  To that end, DDK Hospitality and West Elm executed

a Limited Liability Company Agreement (the "Joint Venture Agreement" or "JV

3

Agreement").  Eventually, disagreement over the vision for the project led West Elm to seek other potential business partners, allegedly in violation of the JV Agreement.  The plaintiffs filed suit in the United States District Court for the Eastern District of New York, asserting claims for, *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment.  West Elm subsequently filed suit against the plaintiffs in the Delaware Court of Chancery, seeking to dissolve the joint venture on the basis of  "decisional deadlock."  The Delaware court dismissed the suit without prejudice, concluding that the allegations in the complaint, taken as true, were insufficient to warrant dissolution at that time.

Following the dismissal of West Elm's claim for dissolution, the plaintiffs demanded, pursuant to Section 21(h) of the JV Agreement, that West Elm reimburse them for the costs and expenses that they had incurred in defending the Delaware action.  West Elm refused.  The plaintiffs then returned to the Eastern District of New York, where they filed a supplemental complaint asserting a claim for breach of the prevailing party provision of Section 21(h).  The defendants moved to dismiss the supplemental complaint and to compel arbitration of the claim for breach of Section 21(h), arguing that the JV

4

Agreement delegated the question of the supplemental claim's arbitrability to the arbitrator.

The district court (I. Leo Glasser, *Judge*) denied the motion to compel, rejecting the defendants' assertion that the JV Agreement's incorporation of the American Arbitration Association ("AAA") Commercial Rules was alone sufficient to evince the parties' clear and unmistakable intent to delegate questions of arbitrability to the arbitrator. The district court reasoned that the JV Agreement provides that the only arbitrable issues are "Disputed Matters," which the agreement defines narrowly, and that this language rendered the parties' intent to delegate arbitrability to the arbitrator "neither clear nor unmistakable." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, No. 19-CV-00226, 2020 WL 4194195, at *12, 2020 U.S. Dist. LEXIS 127593, at *32 (E.D.N.Y. July 20, 2020). Having concluded that the agreement did not clearly delegate the issue of arbitrability to the arbitrator, the district court decided that the plaintiffs' supplemental claim did not fall within the scope of the agreement's alternative dispute resolution procedures and therefore denied the motion to compel arbitration.

The defendants now appeal. They contend that the district court erred in denying the motion to compel arbitration because the JV Agreement expressly

5

delegates questions of arbitrability to the arbitrator. The central question presented in this appeal is thus whether the arbitration agreement delegates the question of arbitrability to the arbitrator rather than the court. For the reasons that follow, we conclude that the arbitration agreement did not "clearly and unmistakably" delegate arbitrability to the arbitrator. We therefore affirm the district court's order denying the defendants' motion to compel arbitration.

## BACKGROUND

*Factual Background*

*A. The Joint Venture*

In 2015, West Elm, a substantial presence in the retail business of home furnishings, decided to develop a chain of hotels to complement that business. As part of that strategy, West Elm's President, James Brett, sought a joint venture partner with expertise in hotel management. Williams-Sonoma, West Elm's parent company and the owner of the West Elm trademark, assisted in the search.

West Elm and Williams-Sonoma eventually selected DDK Hotels to be their joint venture partner and the exclusive operator of the West Elm hotels that would be developed pursuant to the joint venture. In order to effectuate the joint

6

venture, DDK Hotels formed two subsidiaries, DDK Hospitality and DDK Management. Following many months of negotiations, DDK Hospitality and West Elm executed the JV Agreement, which is the operating agreement pursuant to which West Elm Hotels, LLC (the "Company") would carry on its affairs.

DDK Hospitality and West Elm each own 50% of the Company. The JV Agreement refers to each entity as a "member" of the Company. Although the Company is member-managed, under the JV Agreement, the members must act through a six-person board of directors, to which DDK Hospitality and West Elm each appoint three directors. Where board approval is required, both groups of appointees must vote in the affirmative.

This arrangement presented the obvious risk that the board might deadlock on business decisions. The parties therefore agreed to a procedure to address such deadlocks in Section 16 of the JV Agreement, which provides:

16. Deadlock.

(a) Mediation. If the Members (acting through the Board) are unable to agree on a matter requiring Board or Member approval (a "*Deadlock*"), except as provided in Section 16(c) [below], any Member may serve on the other Member a notice (a "*Deadlock Notice*") specifying the matter in dispute (the "*Disputed Matter*"). Promptly following the issuance of a Deadlock Notice, the Members shall set a date, being no later than 20 days

7

after the date on which the Deadlock Notice was issued, for a meeting, at which the Disputed Matter shall be considered. If at the meeting, the Members have still not been able to pass a resolution or reach an agreement regarding the Disputed Matter, then a senior executive of West Elm and a senior executive of DDK [Hospitality] shall promptly meet and use their good faith efforts to resolve as soon as possible the Disputed Matter. If, on the date that is 15 days after the date on which such senior executives first meet pursuant to this Section (the "*Resolution Period*"), the Disputed Matter remains unresolved, any Member may serve on the other Members a written notice (the "*Mediation Notice*") referring the parties to a non-binding mediation process under the auspices of the American Arbitration Association, such process to take place in New York, New York, with a mediator selected by the Members in accordance with this Section, and with expenses of the mediator borne pro rata by the Members. . . . All Members shall participate in the mediation process in good faith.

(b) <u>Arbitration</u>. The parties unconditionally and irrevocably agree that, with the exception of injunctive relief as provided herein, and except as provided in Section 16(c), all Disputed Matters that are not resolved pursuant to the mediation process provided in Section 16(a) may be submitted by either Member to binding arbitration administered by the American Arbitration Association ("AAA") for resolution in accordance with the Commercial Arbitration Rules and Mediation Procedures of the AAA then in effect, and accordingly they hereby consent to personal jurisdiction over them and venue in New York, New York. The demand for arbitration shall be made within a reasonable time after the conclusion of the mediation process by delivery of a written notice (an "*Arbitration Notice*") by the electing Member to the other, and in no event shall it be made after two years from the conclusion of the mediation process. . . .

(c) <u>Fundamental Decisions</u>. Notwithstanding the foregoing to the contrary:

8

(i) a Disputed Matter with respect to any Fundamental Decision shall not be subject to mediation in accordance with Section 16(a) or subject to arbitration in accordance with Section 16(b) . . . .

SA.15-16.[1]

Exhibit C to the JV Agreement provides a "nonexclusive list of matters and decisions that require Board approval," which are subject to Section 16's mediation and arbitration requirements in the event of disagreement amongst the board – i.e., "Disputed Matters." SA.15-16; SA.33-34. These matters include: selecting hotels or hotel projects; approving hotel owners and any transferees or assignees of a hotel owner; approving term sheets (and modifications thereto); issuing or releasing any press statement or marketing materials regarding the JV Agreement; determining the amount and purpose of reserves; approving the terms of any hotel management agreements and technical services agreements; approving any merger or consolidation; authorizing the sale, mortgage, assignment, or transfer of any or all of the Company's assets; causing the Company to enter into another partnership, company, or venture; changing the scope of the Company's business; determining who to hire or terminate for the Company; acting in contravention of the Agreement; engaging in any act that

---

[1] As cited herein, "JA" refers to the Joint Appendix and "SA" refers to the Sealed Appendix.

would make it impossible to carry on the ordinary business of the company; and establishing a subsidiary.  SA.33-34.

> B. *The Demise of the Joint Venture, the Delaware Dissolution Action, and the Plaintiffs' Demand for "Prevailing Party" Fees*

The business venture between West Elm and Williams-Sonoma and DDK Hotels, DDK Hospitality, and DDK Management quickly soured.  In 2017, West Elm's President, James Brett, left West Elm; Alex Bellos replaced him.  Bellos did not share Brett's vision for developing boutique hotels through the joint venture.  Disagreement over Bellos's approach created a rift between the parties, and West Elm allegedly began soliciting new projects with other hospitality companies in violation of the JV Agreement.

Eventually, relations between the members became so strained that on December 12, 2018, the plaintiffs filed suit against the defendants in New York Supreme Court, Kings County, asserting various claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment.  The defendants removed the case to the United States District Court for the Eastern District of New York.

On January 18, 2019, West Elm filed a complaint in the Delaware Court of Chancery, seeking to dissolve the joint venture on the grounds of a lack of viable

10

purpose and decisional deadlock amongst the members (the "Delaware

Dissolution Action").[2] On February 11, 2019, DDK Hospitality moved to dismiss

the action, arguing that West Elm failed to plead a claim for dissolution.

On June 27, 2019, following oral argument, the Delaware Court of

Chancery dismissed West Elm's complaint without prejudice, concluding that

there were insufficient facts alleged in the complaint to establish deadlock or that

the joint venture lacked a viable purpose. The court noted that DDK Hospitality

had filed a lawsuit against the defendants and found it possible that the "lawsuit

could spiral into enough problematic conduct to result in a need for dissolution,"

but concluded that it was "simply at too early a stage for it to be reasonably

conceivable that that is the result that would obtain." JA.99. The court also

pointed out that there were specific provisions in the JV Agreement that seemed

to suggest that certain threshold events needed to occur before dissolution would

be necessary. Lastly, the court pointed to the dispute resolution provisions in

Section 16 of the JV Agreement. The court reasoned that, in the event of

deadlock, the parties should avail themselves of these dispute resolution

---

[2] The JV Agreement is governed by Delaware law. SA.21 ("This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.").

mechanisms before proceeding with a dissolution proceeding. The court explained that "a petition for dissolution should not be the path of first resort." JA.103.

Following the Delaware court's ruling, on July 31, 2019 and August 8, 2019, counsel for DDK Hospitality demanded – pursuant to Section 21(h) of the JV Agreement – that West Elm pay DDK Hospitality $67,594.31 for its reasonable costs, charges and expenses incurred in the Delaware Dissolution Action. Section 21(h) of the JV Agreement provides:

> Prevailing Party. The non-prevailing Member shall pay upon demand all of the reasonable costs, charges and expenses including the court costs and fees and out-of-pocket expenses of counsel, agents and others retained by the prevailing Member incurred by the prevailing Member in enforcing the terms of the Agreement. A Member shall be deemed a "prevailing party" only after all rights of appeal from a favorable adjudication shall have expired or been waived.

SA.21. On August 15, 2019, West Elm's counsel responded by letter, stating that DDK Hospitality was not entitled to payment of costs because it was not a prevailing party as contemplated by the JV Agreement, construed under Delaware law.

## C. The Supplemental Claim for Prevailing Party Fees and West Elm's Motion to Compel Arbitration

On September 3, 2019, the plaintiffs sought leave to file a supplemental complaint in the action in the Eastern District of New York to add a new claim for breach of the prevailing party provision of Section 21(h) of the JV Agreement. West Elm opposed the motion, arguing that the "dispute over the payment of prevailing party fees is a dispute that falls squarely within the list of matters requiring adjudication according to the JV Agreement's mandatory and specific alternative dispute resolution [] procedures." JA.77.

On March 12, 2020, Magistrate Judge Cheryl L. Pollak granted the plaintiffs leave to file their supplemental complaint. The magistrate judge explained that

> [h]aving reviewed the respective provisions of the JV Agreement, the [c]ourt concludes that Section 21(h) of the JV Agreement is the operative provision governing this fee dispute, and that the dispute does not trigger the Section 16 requirement of Board approval. At this stage, looking solely at the allegations in the First Supplemental Complaint, there is no basis for this [c]ourt to conclude that the parties contemplated that this type of dispute would be subject to approval of the joint venture's Board or subject to the alternative dispute resolution provision.

JA.201. On March 13, 2020, the plaintiffs filed their first supplemental complaint, which added a claim alleging that West Elm breached the prevailing party

provision of Section 21(h) when it rejected the plaintiffs' demand that it pay them fees and costs related to the Delaware Dissolution Action.

On March 27, 2020, the defendants filed a motion to dismiss the plaintiffs' supplemental complaint and to compel arbitration of the claim for breach of the prevailing party provision. On July 20, 2020, U.S. District Judge I. Leo Glasser issued a Memorandum and Order denying the defendants' motion. The court explained that

> [w]hile West Elm is correct that incorporating AAA rules typically evinces clear and unmistakable intent to delegate questions of arbitrability, such provisions do not exist in a vacuum. Instead, they must be read in the contexts in which they appear. Here, that is Section 16 of the JV Agreement, which provides that the only arbitrable issues are "Disputed Matters" – instances where "the [JV] Members (acting through the Board) are unable to agree on a matter requiring Board or Member approval." (JV Agreement § 16(a)). As West Elm itself concedes, Section 16 does not submit to arbitration "any" or "all" disputes related to the JV Agreement. (ECF No. 72 at 18). Instead, the JV Agreement explicitly limits the scope of arbitrable issues to "Disputed Matters." That same limitation renders the parties' intent to delegate arbitrability of the supplemental claim neither clear nor unmistakable.
>
> Having determined that the JV Agreement does not clearly or unmistakably delegate the issue of arbitrability, the [c]ourt finds, as Judge Pollak did, that DDK Hospitality's supplemental claim is not subject to Section 16's dispute resolution procedures. In seeking to compel arbitration, West Elm relies on the same argument that Judge Pollak previously rejected, namely, that a demand for fees under Section 21(h) is subject to approval by the JV's board. The [c]ourt cannot endorse that strained reading of Section 21(h), which imposes no obligation on the JV

14

and requires no action by its board. Therefore, the motion to dismiss and compel arbitration is denied.

*DDK Hotels, LLC*, No. 19-CV-00226, 2020 WL 4194195, at *12, 2020 U.S. Dist. LEXIS 127593, at *32-33 (first alteration in original) (footnotes omitted).

The defendants now appeal.

## DISCUSSION

### I.  Standard of Review

"We review *de novo* the denial of a motion to compel arbitration[,]" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 72 (2d Cir. 2017), and the "issue of [whether] arbitrability is for the court or for the arbitrator[,]" *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005).

### II.  Arbitrability

The defendants argue on appeal that the JV Agreement expressly delegates arbitrability questions to the arbitrator and that the district court therefore erroneously resolved the question of whether the supplemental claim falls within the scope of the arbitration agreement when that question should have instead been resolved by the arbitrator.[3]  We conclude, as did the district court, that the

---

[3] The defendants do not separately challenge the district court's holding that the plaintiffs' supplemental claim for breach of the prevailing party provision of the JV Agreement does not fall within the scope of the arbitration provision.  Their arguments

15

arbitration agreement does not evince the parties' clear and unmistakable intent to submit arbitrability disputes to arbitration.  The question concerning the arbitrability of the supplemental claim – whether the supplemental claim for breach of the prevailing party provision constitutes a "Disputed Matter" within the meaning of Section 16 of the JV Agreement – was accordingly one for the district court, not the arbitrator, to decide.

*A.  Legal Standard*

Arbitration is "a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  "Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular

_____

on appeal are instead limited to contesting the district court's conclusion as to *who* should resolve the question of arbitrability (the arbitrator or the court).  In other words, the defendants challenge only the district court's determination that it (rather than the arbitrator) was entitled to decide the arbitrability question; they provide no briefing or argument challenging the district court's determination on the merits that the supplemental claim did not constitute a "Disputed Matter."  The defendants have therefore waived any such argument.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189-90 (2d Cir. 2019). "[A]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the [Federal Arbitration Act ("FAA")] operates on this additional arbitration agreement just as it does on any other." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted). "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must [therefore] respect the parties' decision as embodied in the contract." *Id.* at 528.

We have recognized, however, that "threshold questions of arbitrability," such as whether the arbitration agreement applies to a particular dispute, "presumptively should be resolved by the court and not referred to the arbitrator." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options*, 514 U.S. at 944 (alterations in original) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014) (The party seeking to compel

17

arbitration of arbitrability bears the burden of establishing "clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration."). We "apply ordinary state-law principles that govern the formation of contracts" in conducting this inquiry into the parties' intent. *First Options*, 514 U.S. at 944. "[I]n the absence of an arbitration agreement that clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator, the question whether the particular dispute is subject to an arbitration agreement 'is typically an issue for judicial determination.'" *Bucsek*, 919 F.3d at 191 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)).

This "clear and unmistakable evidence" requirement reflects a departure from the manner in which we treat silence or ambiguity when interpreting whether a particular merits-related dispute falls within the scope of an arbitration agreement. *First Options*, 514 U.S. at 944-45. Where the question is whether a given dispute falls within the scope of the arbitration agreement (and is therefore arbitrable), "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (internal quotation marks

18

omitted).  Where, by contrast, the question is *who* should decide arbitrability, there is a presumption that the question should be resolved by the court.  *See id.*

> [W]hen the parties have a contract that provides for arbitration of some issues[,] . . . the parties likely gave at least some thought to the scope of arbitration.  And, given the law's permissive policies in respect to arbitration, one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter.  On the other hand, the [other] question – the "who (primarily) should decide arbitrability" question – is rather arcane.  A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers.  And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide. . . .

*Id.* at 945 (emphasis in original) (citations omitted).  "This rule is designed to guard against 'the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.'"  *Bucsek*, 919 F.3d at 190 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002)).  It reflects the "fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to adjudication."  *Id.*

19

In determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative. *First Options*, 514 U.S. at 943 ("[T]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." (emphasis omitted)); *Bucsek*, 919 F.3d at 189 ("[W]hat is determinative for deciding whether the arbitrability of a dispute is to be resolved by the court or by the arbitrator is the arbitration agreement."). "[R]arely," however, "do arbitration agreements directly state whether the arbitrator or the court will decide the issue of arbitrability." *Bucsek*, 919 F.3d at 191. In the absence of such clear language, "courts must look to other provisions of the agreements to see what contractual intention can be discerned from them." *Id.*

Where the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve "as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator." *Contec*, 398 F.3d at 208. AAA Commercial Arbitration Rule 7(a) "states with respect to jurisdiction that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" *Id.* (quoting AAA

Commercial Arbitration Rule 7(a)). Because the AAA Commercial Arbitration Rules (the "AAA Rules") explicitly empower an arbitrator to resolve questions of arbitrability, we have found incorporation of these rules into an arbitration agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator. *See id.*; *Doctor's Assocs., LLC v. Tripathi*, 794 F. App'x 91, 94 (2d Cir. 2019) (summary order).

We have also advised, however, that in evaluating the import of incorporation of the AAA Rules (or analogous rules) into an arbitration agreement, context matters. Incorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent. *See Bucsek*, 919 F.3d at 192-95 (incorporation of National Association of Securities Dealers ("NASD") rules, which require arbitration of arbitrability disputes, did not constitute clear and unmistakable evidence of intent to arbitrate arbitrability where the arbitration agreement did not cover disputes arising years after both parties terminated their relationship with the NASD); *NASDAQ OMX*, 770 F.3d

21

at 1031-32 (incorporation of AAA Rules did not constitute clear and unmistakable evidence of intent to arbitrate arbitrability where the arbitration clause was subject to a qualifying provision that created ambiguity as to the parties' intent to delegate arbitrability to the arbitrator); *cf. Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (concluding that arbitrability was for the district court, rather than the arbitrator, to decide where the contract contained "both a broadly worded arbitration clause and a specific clause assigning a certain decision to an independent accountant," because the presence of both clauses created ambiguity as to the parties' intent to arbitrate questions of arbitrability).

Accordingly, where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this – coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability – constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator. *See, e.g.*, *Bucsek*, 919 F.3d at 191 ("Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability[.]"); *Contec*, 398 F.3d at 208 (arbitration clause agreeing to submit to arbitration "any controversy arising with respect to" the agreement, read in conjunction with incorporation of AAA Rules,

22

constituted clear and unmistakable evidence of intent to arbitrate arbitrability);

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 118, 120-22 (2d Cir. 2003)

(arbitration agreement providing for "all disputes" to be referred to arbitration,

coupled with incorporation of rules that delegated arbitrability to the arbitrator,

constituted clear and unmistakable evidence of intent to arbitrate arbitrability).

Moreover, "the clearer it is from the agreement that the parties intended to

arbitrate the particular dispute presented, the more logical and likely the

inference that they intended to arbitrate the arbitrability of the dispute." *Bucsek*,

919 F.3d at 191.

Where, by contrast, the arbitration agreement is narrower, vague, or

contains exclusionary language suggesting that the parties consented to arbitrate

only a limited subset of disputes, incorporation of rules that empower an

arbitrator to decide issues of arbitrability, standing alone, does not suffice to

establish the requisite clear and unmistakable inference of intent to arbitrate

arbitrability. *See id.* ("[T]he clearer it is that the terms of the arbitration

agreement reject arbitration of the dispute, the less likely it is that the parties

intended to be bound to arbitrate the question of arbitrability, unless they

included clear language so providing, and vague provisions as to whether the

23

dispute is arbitrable are unlikely to provide the needed clear and unmistakable inference of intent to arbitrate its arbitrability."); *NASDAQ OMX*, 770 F.3d at 1031 ("[W]here a broad arbitration clause is subject to a qualifying provision that at least arguably covers the present dispute . . . we have identified ambiguity as to the parties' intent to have questions of arbitrability . . . decided by an arbitrator.").

    *B.  Application*

Here, Section 16 of the JV Agreement sets forth an alternative dispute resolution procedure in the event that the board deadlocks on business decisions. Consistent with this overriding purpose, the provision is narrow in scope. As noted above and relevant here, Section 16 provides:

> 16.  <u>Deadlock</u>.
>
> (a)  <u>Mediation</u>.  If the Members (acting through the Board) are unable to agree on *a matter requiring Board or Member approval* (a "*Deadlock*"), except as provided in Section 16(c), any Member may serve on the other Member a notice (a "*Deadlock Notice*") *specifying the matter in dispute* (the "*Disputed Matter*").
>
>     . . . .
>
> (b)  <u>Arbitration</u>.  The parties unconditionally and irrevocably agree that, with the exception of injunctive relief as provided herein, and except as provided in Section 16(c), *all Disputed Matters that are not resolved pursuant to the mediation process provided in Section 16(a) may be submitted by either Member to binding arbitration* administered by the American Arbitration Association ("*AAA*") for resolution in accordance with the Commercial Arbitration Rules and Mediation Procedures of the AAA then in effect . . . .

SA.15-16 (emphases added). The alternative dispute resolution procedure outlined in Section 16 does not apply to "any controversy," "all claims," or "all disputes." Rather, the "Deadlock" section is a corporate governance mechanism that applies only to "Disputed Matters," which are defined as matters "requiring Board or Member approval" on which the board is unable to reach agreement. SA.15. The limited scope of this provision creates ambiguity as to whether the parties clearly and unmistakably intended to delegate the question of arbitrability to the arbitrator, particularly where, as here, it is arguable that the dispute over prevailing party fees does not qualify as a "Disputed Matter." *See Bucsek*, 919 F.3d at 191; *NASDAQ OMX*, 770 F.3d at 1031.

Indeed, Exhibit C to the JV Agreement provides a nonexclusive list of matters and decisions that require board approval. Payment of prevailing party fees pursuant to Section 21(h) is not on that list, suggesting that disputes under Section 21(h) may very well fall outside the scope of Section 16. And Section 21(h) provides that

> [t]he non-prevailing Member *shall pay upon demand* all of the reasonable costs, charges and expenses including the court costs and fees and out-of-pocket expenses of counsel, agents and others retained by the prevailing Member incurred by the prevailing Member in enforcing the terms of the Agreement.

25

SA. 21 (emphasis added). Nothing in this provision suggests that such relief is contingent upon board approval; to the contrary, it unambiguously directs the non-prevailing member to pay such costs and fees "upon demand." *Id.* Moreover, the payment of prevailing party fees following litigation between members of the Company is quite removed from the Company and its board. The Company did not initiate the Delaware Dissolution Action, did not cause DDK Hospitality to incur litigation costs, did not violate the JV Agreement, is not obligated to pay either member's legal fees, and has no say in deciding whether or what amount of fees should be paid. Rather, Section 21(h) creates a freestanding right for the prevailing party to recover reasonable costs and fees incurred in enforcing the terms of the JV Agreement. Because the Company has no role to play in this dispute, its board has no decision to make on behalf of the Company with respect to prevailing party fees. The matter of prevailing party fees therefore (at the very least) arguably does not fall within the scope of the arbitration agreement, "making it far from 'clear and unmistakable' that the [arbitration agreement] provides [the defendants] with an arbitrable claim," let alone "that [the parties] clearly and unmistakably committed questions of arbitrability to an arbitrator rather than the court." *NASDAQ OMX*, 770 F.3d at

26

1031-32; *see Bucsek*, 919 F.3d at 195 (The fact that the arbitration agreement "cannot be reasonably interpreted to provide for arbitration of the dispute . . . is a substantial makeweight against [construing the agreement to provide for arbitration of arbitrability] unless counterbalanced by clear language contradicting the logical inference that parties who clearly agree not to arbitrate a particular type of dispute are unlikely to intend to arbitrate the arbitrability of such a dispute.").

While the arbitration agreement does indeed incorporate the AAA Rules, which empower the arbitrator to resolve questions of arbitrability, Section 16(b) provides that the AAA Rules "apply to such arbitrations as may arise under the [JV] Agreement." *See NASDAQ OMX*, 770 F.3d at 1032; SA.16. Because Section 16(b)'s arbitration clause applies only to "Disputed Matters" not resolved pursuant to the mediation process outlined in Section 16(a), the AAA Rules do not apply "until a decision is made as to whether [DDK Hospitality's supplemental claim] does or does not fall within the intended scope of arbitration[.]" *NASDAQ OMX*, 770 F.3d at 1032. In other words, whether the AAA Rules, including Rule 7(a), apply turns on the conditional premise that the dispute falls within the definition of "Disputed Matter." If it does not, then the

AAA Rules do not govern and no delegation of authority to the arbitrator to resolve questions of arbitrability arises. The narrow scope of the arbitration provision therefore obscures the import of the incorporation of the AAA Rules and creates ambiguity as to the parties' intent to delegate arbitrability to the arbitrator.[4]

This conclusion is supported by our decision in *NASDAQ OMX*, which involved a set of facts similar to those presented here. There, the NASDAQ OMX Group, Inc., and NASDAQ Stock Market LLC (collectively, "NASDAQ") initiated an action to preclude UBS from pursuing arbitration, and the district court entered a preliminary injunction awarding NASDAQ its requested relief. *See NASDAQ OMX*, 770 F.3d at 1012-13. UBS appealed, arguing that the district court "erred in concluding that it, rather than an arbitrator, should decide whether UBS's claims" were arbitrable. *Id.* at 1031. UBS contended that the

---

[4] It is for this reason that *Contec*, which the defendants rely on for support, does not compel a different result. In *Contec*, we found that incorporation of the AAA Rules evinced clear and unmistakable intent to delegate the question of arbitrability to the arbitrator where the arbitration agreement provided that the parties would submit "any controversy arising with respect to this Agreement" to arbitration. 398 F.3d at 208. Unlike the parties in *Contec*, West Elm and DDK Hospitality have no "agreed-to obligation to arbitrate all disputes, including the question of arbitrability." *Id.* at 211 (emphasis omitted). Instead, they agreed to arbitrate only "Disputed Matters," and the AAA Commercial Arbitration Rules (and its delegation of arbitrability) thus apply only to Disputed Matters.

arbitration agreement's incorporation of the AAA Rules provided clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator. *Id.* at 1032. We rejected this argument, explaining that:

> We have found the "clear and unmistakable" provision satisfied where a broad arbitration clause expressly commits all disputes to arbitration, concluding that *all* disputes necessarily includes disputes as to arbitrability. But we have not reached the same conclusion where a broad arbitration clause is subject to a qualifying provision that at least arguably covers the present dispute. In such circumstances, we have identified ambiguity as to the parties' intent to have questions of arbitrability – which would include whether a dispute falls within or outside the scope of the qualifier – decided by an arbitrator. Here, the broad arbitration clause in the parties' Services Agreement is subject to qualification: "*Except as may be provided in the NASDAQ OMX Requirements*, all claims, disputes, controversies and other matters in question between the Parties to this Agreement . . . shall be settled by final and binding arbitration." . . . [O]ne of the provisions of the NASDAQ OMX Requirements at least arguably immunizes NASDAQ from liability for the type of claim asserted by UBS, making it far from "clear and unmistakable" that the Services Agreement provides UBS with an arbitrable claim. Thus, we cannot conclude that UBS and NASDAQ clearly and unmistakably committed questions of arbitrability to an arbitrator rather than the court.

*Id.* at 1031-32 (emphases and first alteration in original) (citations omitted). We further explained that while the arbitration agreement incorporated the AAA Rules, it did "not clearly and unmistakably direct that questions of arbitrability be decided by AAA [R]ules; rather, it provides for AAA [R]ules to apply to such arbitrations as may arise under the Agreement." *Id.* at 1032. In other words, the

29

AAA Rules could not apply to a given dispute "until a decision [wa]s made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided." *Id.* We therefore concluded that the district court (rather than the arbitrator) should resolve arbitrability. *Id.*

The defendants argue that *NASDAQ OMX* is inapposite because it involved an express carve-out from the arbitration agreement that arguably applied to the dispute before the court. The defendants point out that Section 16's dispute resolution provisions contain two express exceptions for injunctive relief and "Fundamental Decisions" and contend that, because both parties agree that the present dispute does not fall within either of those categories, *NASDAQ OMX* does not apply here. But the defendants' reading of *NASDAQ OMX* is inconsistent with the principles articulated in that decision. Section 16 of the JV Agreement acts as a carve-in or qualifying provision that provides for arbitration of only a limited subset of controversies – namely, "Disputed Matters," which are defined as matters requiring board approval upon which the board is unable to agree. There is no functional difference between an express carve-out or carve-in provision – both limit the scope of the matters the parties agreed to arbitrate. The critical inquiry in *NASDAQ OMX* was whether the plain language of the

arbitration agreement clearly and unmistakably delegated arbitrability to the arbitrator; where there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator.  *See id.* at 1031.

We reaffirmed the principles that we articulated in *NASDAQ OMX* in *Bucsek*.  There, we explained that it is necessary to look to the plain language of the arbitration agreement to discern whether the parties clearly and unmistakably intended to delegate the arbitrability determination to the arbitrator.  *See Bucsek*, 919 F.3d at 190-92.  We instructed that

> [i]n the absence of language that directly addresses the issue, courts must look to other provisions of the agreements to see what contractual intention can be discerned from them.  Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability, and the clearer it is from the agreement that the parties intended to arbitrate the particular dispute presented, the more logical and likely the inference that they intended to arbitrate the arbitrability of the dispute.
> . . . .
> In contrast, the clearer it is that the terms of the arbitration agreement reject arbitration of the dispute, the less likely it is that the parties intended to be bound to arbitrate the question of arbitrability, unless they included clear language so providing, and vague provisions as to whether the dispute is arbitrable are unlikely to provide the needed clear and unmistakable inference of intent to arbitrate its arbitrability.

31

*Id.* at 191.[5]

In light of the narrow arbitration provision in the JV Agreement and the fact that disputes relating to Section 21(h)'s prevailing party provision arguably do not qualify as a "Disputed Matter," the defendants have failed to carry their burden of establishing clear and unmistakable evidence of the parties' intent to delegate arbitrability to the arbitrator. *See NASDAQ OMX*, 770 F.3d at 1032. The parties could have unambiguously delegated arbitrability to the arbitrator by including a provision expressly stating that all disputes concerning arbitrability would be resolved by the arbitrator. They did not do so. We "are not empowered to re-write their agreement." *Archer & White Sales, Inc. v. Henry*

---

[5] The defendants argue that *Bucsek* has no application here because it involved incorporation of the National Association of Securities Dealers ("NASD") code and Financial Industry Regulatory Authority ("FINRA") code as opposed to the AAA Rules. But in *Bucsek*, we expressly noted that both the NASD and FINRA codes – like the AAA Rules – provide the arbitrator with "authority to interpret and determine the applicability of all provisions of the Code." *Bucsek*, 919 F.3d at 189, 193-94. There is no meaningful difference between the delegation provision in the NASD and FINRA codes and the AAA Rules. In *Bucsek*, the arbitration agreement's incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, was insufficient to evince the parties' clear and unmistakable intent to delegate arbitrability to the arbitrability because "other aspects of the agreement argue[d] powerfully against that inference." *Id.* at 195. That is exactly the situation presented here.

In addition, *Bucsek* announced broad rules regarding how to interpret agreements to determine whether they delegate arbitrability to the arbitrator. *See id.* at 191. Nothing in *Bucsek* suggests that these principles should be limited to the facts presented in that case.

*Schein, Inc.*, 935 F.3d 274, 282 (5th Cir. 2019).  The district court therefore correctly determined that it, rather than the arbitrator, should decide whether the supplemental claim was arbitrable.[6]

### III.    DDK Hospitality's Request for Prevailing Party Fees

DDK Hospitality contends that "[s]ince prevailing in the Delaware Dissolution Action, and incurring $67,594.31 in fees, [it] has been forced to bring

---

[6] The defendants object to this outcome (as well as our reasoning that underlies it) as inconsistent with the Supreme Court's decision in *Henry Schein*.  But we already considered, and rejected, this argument in *Bucsek*.  *See Bucsek*, 919 F.3d at 195-96.  As we explained there, *see id.*, *Henry Schein* concerned the validity of a judicially-crafted exception to arbitrability, which allowed courts to override an arbitration agreement's delegation of arbitrability to the arbitrator where they found that the argument for arbitrability of the claim was "wholly groundless."  *See Henry Schein*, 139 S. Ct. at 529.  The Supreme Court concluded that this exception was inconsistent with both the text of the FAA and its precedent, and remanded the case for a determination of whether the contract had, in fact, delegated the question of arbitrability to the arbitrator.  *Id.* at 529-31.

Our conclusion that the JV Agreement does not delegate arbitrability to the arbitrator in this case flows from an analysis of the language of the arbitration agreement consistent with the Supreme Court's directive that courts "not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so," *First Options*, 514 U.S. at 944, not the application of a "wholly groundless" exception to what the parties have contracted for, *see Bucsek*, 919 F.3d at 195-96.  The JV Agreement contains no express delegation of authority to the arbitrator to resolve questions of arbitrability.  While the JV Agreement incorporates the AAA Rules, the import of these rules is rendered ambiguous by the narrow arbitration provision which suggests that the parties did not contemplate a delegation of arbitrability in this case. We therefore reject the defendants' argument that they are entitled to arbitrate arbitrability "because, upon consideration of all evidence of the intentions of the arbitration agreement . . . the agreement does not clearly and unambiguously provide for arbitration of the question of arbitrability."  *Id.* at 196.

a contested motion to file a supplemental complaint to assert its claim for West Elm's breach of Section 21(h) of the JV Agreement, oppose [W]est Elm's motion to dismiss or compel arbitration and now respond to this appeal." Pl. Br. at 39. DDK Hospitality accordingly requests that this Court "direct DDK Hospitality to submit an application, either to this Court or to [the] district court, for prevailing party fees incurred in this appeal, pursuant to Section 21(h) of the JV Agreement." *Id.*

DDK Hospitality's request for such fees, directed to us, is improper. If DDK Hospitality is asserting that West Elm has breached the JV Agreement by failing to pay fees it owes in connection with the litigation arising out of DDK's supplemental claim, DDK would appear to be free – in the district court – to amend its complaint, supplement its allegations for breach of contract, or assert a new claim for breach of contract of Section 21(h) of the JV Agreement, or some combination thereof. DDK Hospitality may then seek relief from the district court in the form of costs or fees that it contends it is owed. DDK Hospitality cannot request such relief on appeal, though, when the question of whether DDK Hospitality is or should be entitled to such fees has not yet been resolved by the district court in the first instance, has not been briefed by the parties either there

34

or on appeal, and would require further fact-finding to resolve. *See, e.g., Dague v. City of Burlington*, 976 F.2d 801, 803-04 (2d Cir. 1991) ("Determining the amount of a reasonable attorney's fee, ultimately a decision that may combine extensive fact finding with a large amount of discretion, is a process well suited to the usual functions and operations of the trial court . . . . An appellate panel is simply not equipped to give proper consideration to the many-faceted factual disputes that may affect a claim for attorney's fees."); *Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co.*, 838 F. App'x 649, 652 (2d Cir. 2021) (summary order) (rejecting, for the same reasons, the plaintiff's request for attorney's fees and costs for defending the appeal). We therefore reject DDK Hospitality's fee application. DDK Hospitality may pursue its request for fees on remand.

## CONCLUSION

We have considered the defendants' remaining arguments on appeal and conclude that they are without merit. We therefore AFFIRM the order of the district court denying the defendants' motion to compel arbitration.